## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

HYDRO SYSTEMS, INC., a California company,

Plaintiff/Counterclaim Defendant,

v.

FACTORY AUTOMATION SYSTEMS, INC., a Georgia company,

Defendant/Counterclaim Plaintiff.

Civil Action No.
1:23-cv-03492-VMC

## OPINION AND ORDER

This matter is before the Court on cross-motions for partial summary judgment. (Docs. 29, 30). For the reasons that follow, the Court will grant Defendant/Counterclaim Plaintiff Factory Automation Systems, Inc.'s ("FAS") motion and grant in part and deny in part Plaintiff/Counterclaim Defendant Hydro Systems, Inc.'s ("Hydro Systems") motion.

### Background[1]

### I.    The Proposal

On August 31, 2021, Hydro Systems accepted a proposal offered by FAS to purchase two robotic systems to automate the sanding and polishing of bathtubs

_____

[1] The following facts are drawn from the parties' respective Statements of Material Facts. Citation to the relevant responsive statement without explanation or clarification indicates the Court has deemed the underlying statement admitted. For clarity and ease of reading, the Court omits quotation marks from admitted

at Hydro Systems in McDonough, GA for a purchase price of $1,160,000. ("Proposal," Doc. 32-1 ¶ 1, Doc. 33-7 ¶ 16, Doc. 1-1). That same day, On August 31, 2021, Hydro Systems paid FAS $348,000, representing a down payment of 30% of the total price. (Doc. 33-7 ¶ 17).

The Proposal included a basis section with the following items:

> ➢ Each robot cell will be capable of bathtub models with maximum dimensions up to 36 inches wide by 72 inches long. For larger tubs, FAS must evaluate robot reach using the 3D models of each tub.

> ➢ As requested, our scope of work and pricing is based on programming twelve unique tub models. For reference, each of the three sizes within the Alamo family will require its own robot program.

> ➢ The sanding process will use three sandpaper grits of 220, 400, and 1000.

> ➢ Gel coating will be manually applied after the sanding process and before the polishing process. FAS has no scope of work related to gel coat application.

> ➢ The polishing process will use two buffing compounds.

> ➢ Hydro Systems will provide 3D models for every tub to be programmed.

(Doc. 1-1 at 1). The scope of work summary excluded the following:

---

statements that are reproduced in this Order. Citations to the Proposal and the parties' respective briefs are to the internal pagination, rather than the ECF header stamps, unless indicated otherwise.

Tub locating fixtures are not currently included in the scope of work/pricing. FAS will require 3D models of each tub in order to quote the tub fixtures.

Parts introduced into each system must be consistent with an "ideal" or nominal part. Parts that are out- of-range will cause system faults and production stoppage.

These robot systems will process tubs to a more consistent finish in less time than manual labor, but there are no provisions for correcting issues from the molding process or repair/rework process.

(*Id.*). These exclusions were clarified in Appendix A, Rev. 4:

- Gel coating not included within scope of work ("SOW"). Is Hydro going to be performing gel coating?

   **Correct – Gel Coating is outside the scope of this project.**

   . . . .

- There are no provisions for correcting issues from the molding process or repair/rework process. What happens if there is an issue? Who is responsible for remedying the issue and who is liable for the cost?

   **Quality issues from the molding or repair processes cannot be overcome by the sanding robot. These types of issues are outside our control and clearly not in our scope of work. Repairs need to meet Hydro Systems' quality standards before a tub is loading into the sanding robot system.**

(*Id.* at 10).

The Proposal stated that "[t]he system will be ready for [testing] in approximately 24-28 weeks after receipt of order and down payment." (*Id.* ¶ 21). Approximately 24-28 weeks after the order and down payment would fall

3

between February 15 and March 15, 2022. (*Id.* ¶ 22). More than 36 weeks after the order and down payment, on May 10, 2022, neither robot was complete or ready for testing. (*Id.* ¶ 23). In an email on May 11, 2022, FAS told Hydro Systems that the Polishing Robot could be in "near production-ready condition" at FAS the week of June 6, and that the Sanding Robot "can potentially be deployed in your facility approximately 30-days after the Polishing Cell is installed and operating." (*Id.* ¶ 24).

The Proposal called for two testing phases, with criteria for the tests to be agreed upon later during the design and engineering phases. (Doc. 1-1 at 4–5). The first, Factory Acceptance Testing (FAT), was to be employed in FAS's shop prior to delivery to Hydro Systems' facility:

> During the design and engineering phases, the FAS project manager will work with Hydro Systems to establish the Factory Acceptance Test criteria. FAS will stage the system and test performance in our shop. Then during the FAT, the Hydro Systems team will have the opportunity to inspect the hardware and observe the system in operation.

(*Id.* at 4). The second, Site Acceptance Testing, would occur at Hydro System's facility: "Site acceptance criteria will be agreed upon by FAS and Hydro Systems during the engineering phase of the project." (*Id.* at 5). Under the Proposal, 10% of the purchase price was due within thirty days of the "[c]ompletion of FAT at FAS," and another 10% within thirty days of the "[c]ompletion of [s]tart-up at Hydro

Systems' facility," which was "not to exceed 30 days from shipment." (Doc. 33-7 ¶ 83).

## II.    Proposal Terms and Conditions

The Proposal ends with a list of Terms and Conditions. Provisions relevant to this case include the following:

> **10) LIMITATION OF LIABILITY**: Factory Automation Systems will at Purchaser's request submit Certificates of Insurance from companies chosen by Factory Automation Systems showing our limits of coverage. Factory Automation Systems agrees to indemnify and save harmless Purchaser only against liability imposed on Purchaser by law with respect to bodily injury or property damage to the extent such liability results from the performance of Factory Automation Systems under this contract. Factory Automation Systems does not agree to indemnify and save Purchaser harmless except as set forth herein. Purchaser agrees to indemnify and save harmless Factory Automation Systems for all loss, cost or damage incurred by Factory Automation Systems as a result of Purchaser's or third parties' misuse or misapplication of Factory Automation Systems supplied products. In no event, regardless of cause, shall Factory Automation Systems be liable for incidental or consequential damage either real or alleged.

> **11) WARRANTY:** Factory Automation Systems passes manufacturer warranties to Purchaser for hardware and packaged software used in our systems. Our integration services, including engineering, software, wiring work and documentation are warranted to be free from defects for a period of one year from delivery. FACTORY AUTOMATION SYSTEMS' WARRANTY IS LIMITED TO REPAIR OR REPLACEMENT OF THE DEFECTIVE WORK AT OUR OPTION AND IN NO WAY INCLUDES INCIDENTAL OR CONSEQUESTIAL

> DAMAGES. FACTORY AUTOMATION SYSTEMS MAKES NO OTHER REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESSED OR IMPLIED, AS TO THE MERCHANTABILITY, FITNESS FOR PURPOSE OR OTHER MATTER WITH RESPECT TO ANY OF THE GOODS OR SERVICES.

(Doc. 1-1 at 8–9). The Proposal also has an Appendix which includes revisions to the terms, including the following:

> • Limitation of Liability – Propose making the limitation of liability re incidental or consequential damages mutual. Proposed language "In no event, regardless of cause, shall either party be liable to the other, for incidental or consequential damage, either real or alleged."
>
> Agreed

(*Id.* at 11).

> The Integration Services warranty will be extended to 24 months on this initial purchase order from Hydro Systems. Future projects will revert to the standard 12-month warranty, or Hydro Systems can purchase an extended warranty. Other than the adjustment to Integration Services, the remainder of Article 11 in the FAS Terms and Conditions is unchanged.

(*Id.* at 12).

## III.    Development and Deployment of the Robots

In June 2022, before delivering the Polishing Robot, FAS invited Hydro Systems to observe testing at FAS (Doc. 33-7 ¶ 27). Hydro Systems' Vice President Kevin Steinhardt attended this testing in person on June 9, 2022. (Doc. 33-7 ¶¶ 2, 28). FAS contends that this test constituted the FAT for the Polishing Robot, which

Hydro Systems disputes. (Doc. 45 ¶ 35). Brian Hiltz, the Director of Management and Resource Planning at FAS, oversaw the presentation. (Affidavit of Brian Hiltz dated April 8, 2024, "Hiltz Aff.," Doc. 33-4 ¶¶ 2, 8). During this visit to FAS, Kevin Steinhardt asked FAS about the possibility of alarms to notify Hydro Systems of faults when the systems run unattended overnight, or "lights out." (Doc. 33-7 ¶ 29).

During the presentation, the polishing spindle fell off the Polishing Robot while it was operating, and a polishing tool rubbed against the tub. (*Id.* ¶ 30). However, according to Mr. Hiltz's account of the presentation, Mr. Steinhardt indicated that he was pleased with the results and raised no issue regarding the finished tub quality. (Hiltz Aff. ¶¶ 9–10).[2] Hydro Systems did not sign any approval or acceptance during this June 9, 2022 testing attempt. (Doc. 33-7 ¶ 31). But Hydro Systems did instruct FAS to ship and install the Polishing Robot, even

---

[2] Hydro Systems' personal knowledge objection (Doc. 45 ¶ 36) is overruled because Mr. Hiltz averred that he oversaw the demonstration. (Hiltz Aff. ¶ 8). Hydro Systems' hearsay objection is overruled because Mr. Hiltz testified about a statement Mr. Steinhardt made in the scope of his employment relationship with Hydro Systems. Fed. R. Evid. 801(d)(2)(D). Mr. Steinhardt offered his own declaration in connection with the motions (Doc. 30-4) and could have supplemented his testimony by disputing that Mr. Hiltz was present, by denying that he indicated that he was pleased, or by denying that he raised no issue regarding the finished tub quality. Instead, Mr. Steinhardt only testified that he "did not consider the Polishing Robot complete at this time," which does not create a fact dispute as to what he said at the demonstration. (Doc. 30-4 ¶ 40).

though Hydro Systems had only provided FAS with three of the twelve tub models for testing. (*Id.* ¶ 37).[3] As a result, despite the fact that the Proposal stated that "FAS will program twelve designated tub models for both sanding and polishing" and that the "scope of work and pricing is based on programming twelve unique tub models," when the Polishing Robot arrived at Hydro Systems, it was only programmed to process three models. (Doc. 33-7 ¶¶ 34–35). As to those three models, the Parties dispute whether the Polishing Robot functioned poorly and if so whether the fault was on Hydro Systems for utilizing a process that differed from what was described and sampled. (Doc. 33-7 ¶ 36). Nonetheless, all of the models had to be reprogrammed several times. (Doc. 33-7 ¶ 37). In any case, FAS delivered the Polishing Robot to Hydro Systems on approximately June 20, 2022, 42 weeks after the order and down payment. (Doc. 33-7 ¶ 25).

Shortly after that, FAS's Project Manager Scott Seitz called Mr. Steinhardt to schedule a FAT for the sanding robot on June 21, 2022. (Affidavit of Scott Seitz

---

[3] Hydro Systems' hearsay objection is overruled for the reasons the Court gave in note 2. Additionally, to the extent that Hydro Systems contends that Mr. Hiltz's testimony itself constitutes hearsay, the Court "may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999). Hydro Systems does not contend that Mr. Hiltz would be unable to testify at trial.

dated April 8, 2024, "Seitz Aff." Doc. 33-3 ¶ 39).[4] Mr. Steinhardt declined to attend

and opted to have FAS ship the robot to Hydro Systems instead. (*Id.*).

Hydro Systems sent FAS an email dated July 5, 2022 stating that

> "the tubs are all coming out with scratches on them. The
> scratches are in a specific pattern and clearly coming
> from the robot . . . . It is clear to me that that these tubs
> were not closely inspected when you tested them at your
> place . . . when inspected closely all the scratches can be
> seen. We are now stuck doing R&D instead of producing
> product.

(Doc. 33-7 ¶ 38).

FAS delivered the Sanding Robot to Hydro Systems[5] on approximately July

11, 2022, 45 weeks after the order and down payment. (Doc. 33-7 ¶ 26). The Parties

likewise dispute whether the Sanding Robot was incomplete and whether it

performed poorly, and whether any functionality problems with the Standing

Robot were the fault of Hydro Systems. (*Id.* ¶ 39). The Proposal stated that "[t]he

system will include an automatic sandpaper exchange system to accommodate

three grits of sandpaper," but when it was delivered, the Sanding Robot had no

---

[4] Hydro Systems' hearsay objection to Mr. Seitz's affidavit (Doc. 45 ¶ 38) is
overruled for substantially the same reasons the Court gave in notes 2 and 3,
above. The remainder of Hydro Systems' objection that Mr. Seitz's statement "is a
conclusory allegation without specific supporting facts, documentation, or record
evidence" goes to weight, not admissibility.

[5] The Court assumes the reference to FAS delivering the robot to FAS was a
typographical error.

automatic sandpaper exchange. (*Id.* ¶ 40–41). FAS contends that the parties mutually departed from this portion of the Proposal at an October 18, 2021 meeting by agreeing to replace the sandpaper exchange system in the Proposal with a tool that exchanges the entire spindle rather than just the paper. (Seitz Aff. ¶ 12). The Proposal's list of "Deliverables" from FAS also included a "Robot End-of-Arm Tool" described as a vacuum hose to connect sander to Hydro Systems-supplied vacuum collection system." (Doc. 33-7 ¶ 43). Hydro Systems purchased a vacuum system for this purpose, but the Sanding Robot did not have (and has never had) a vacuum hose. (*Id.* ¶ 44). FAS contends that the Parties agreed to remove the vacuum hose connection from the scope as part of the changes at the same October 2021 meeting. (Seitz Aff. ¶ 13).

By July 2022, almost a full year after Hydro Systems paid the down payment to FAS, FAS had programmed only five models into the robots. (*Id.* ¶ 45). Mr. Steinhardt contends that even these five models did not work correctly, but FAS's President Jim Pursley blames Hydro Systems for providing samples that differed from their manufacturing process, among other reasons. (Affidavit of Jim Pursley dated April 8, 2024 "Pursley Aff.," Doc. 33-5 ¶¶ 2, 5).

By email dated July 26, 2022, Hydro Systems informed FAS of the following:

> a. "The [Proposal] calls for the programming of twelve unique tub models. To date, 5 models have been programmed."

10

b. "Robot was to use less time than manual labor. At 25mm/sec, this doesn't represent less time than we currently use."

c. "[W]e are a long way from operating in an efficient manner, and in a way that was represented in [the Proposal]. Please do not consider the robots to have passed Site Acceptance at this time until FAS can correct the [outstanding] issues."

(Doc. 33-7 ¶ 47).[6] By letter dated August 9, 2022, Hydro Systems notified FAS as follows:

a. "[T]o date, [FAS] has failed to provide an acceptable robotic system for sanding and polishing our bathtubs as proposed[.]"

b. "The robot systems were to provide more consistent finish in less time than our manual process. To date, the finish is less consistent, and forcing us to do much rework[.]"

c. "The PolishingBot, as programmed, will not even remove 1500 grit scratches. These scratches are being removed manually in our Detailing department. By comparison, an employee using a manual polishing buffer can remove 1000 grit scratches with minimal effort. This deems the investment in the PolishBot completely worthless."

d. "Hydro Systems has spent over $40,000 in rework costs, not to mention lost profits during the so-called start-up phase of the robots."

---

[6] FAS's objection to Hydro Systems offering the email through Kevin Steinhardt is overruled; Mr. Steinhardt laid the foundation for his personal knowledge. (Doc. 30-4 ¶ 49). The remaining objections are also overruled.

(*Id.* ¶ 48).[7]

Mr. Pursley responded in a letter to Mr. Steinhardt dated August 22, 2022. (Doc. 30-4 at ECF pp. 92–100).[8] The letter begins as follows:

> I am disheartened that our relationship has turned contentious. We have continually worked with Hydro on this project in the spirit of partnership. We have accommodated process changes and delays on items outside of our scope. We have made concessions on overages and scope changes and offered further concessions, all with the aim of building a partnership for the future. Despite the current situation, I am still hopeful that we can work together to solve the problems in front of us.

(*Id.* at 1). In the letter, Mr. Pursley breaks down Mr. Steinhardt's points one by one and responds at length. For example, he writes that "[a]ny delays are the result of (1) Hydro's failure to make all twelve tubs and associated fixtures available to FAS for testing, (2) Hydro's decision to apply the gel coating before sanding, and (3) Hydro's failure to perform dust collection, as specified in the Project Proposal." (*Id.* at 4). "Programming tubs at your facility," he explained, "takes significantly more time than if we would have received the tubs and fixtures to program the tubs at our shop. We save the travel time, but more importantly, we have our tools and resources, and we are not working around production schedules." (*Id.*). The

_____

[7] Hydro Systems' objection to Kevin Steinhardt laying the foundation for this document is overruled for substantially the same reasons given in note 6, above.

[8] The Court uses the letter's internal pagination for subsequent citations.

letter enumerates the following problems that Mr. Pursley asserted Hydro

Systems caused:

> In addition to Hydro's failure to provide us with the necessary tubs and fixtures, there are two other problems that must be addressed. The first is Hydro's decision to apply the gel coat prior to sanding. The second is the Hydro's failure to collect the dust created by this process change. These issues lie at the root of many smaller issues raised throughout your letter. The process was discussed in depth with Hydro in the pre-sales cycle. As clearly stated in the proposal, 'Gel coating will be manually applied after the sanding process and before the polishing process. FAS has no scope of work related to gel coat application'. . . . The tubs provided by Hydro for sanding have gel coating already applied. Sanding after gel coat is applied drastically changes the process. The result of these problems is:

> • Product quality implications. Sanding a tub to prepare for gel coat application is completely different than sanding after the gel coat is applied. The difference is similar sanding something before painting versus after a high shine paint is applied.

> • [Redacted] has also indicated that not removing dust between sanding grit passes may cause debris from one sanding pass to cause scratches on subsequent passes. Hydro is responsible for dust collection which to our knowledge has not been installed.

> • Reduced sanding pad life. The FAS application you reference from "YouTube" is sanding before gel coat is applied. These pads will last for multiple tubs. Sanding gel coat clogs the sanding pad and reduces the pad life. The lack of dust collection also affects the sanding pad life. Dust from previous sanding passed will fill the pad with dust (a.k.a. clogging) which reduces the pad life.

• Increased number of grits required. The "YouTube" referenced Sander uses 2 grits. Per Hydro's request, as defined in the proposal, "The sanding process will use three sandpaper grits of 220, 400, and 1000". Hydro has reported that the revised process requires a 6-grit progression to meet the desired quality. These additional grits that are allegedly required are related to the process change.

• Explosive dust hazard. The significant danger presented by this dust is addressed as a standalone topic below.

(*Id.* at 6–7).

After threats of legal action and some back and forth, in September 2022, FAS resumed work on programming. (Doc. 33-7 at 52). In November 2022, the Polishing Robot went idle for a month, after the Sanding Robot smashed into the tub it was sanding, breaking the tub. (*Id.* ¶ 53). FAS took components from the Polishing Robot and installed them into the Sanding Robot, leaving the Polishing Robot unusable while awaiting parts to replace those FAS had removed. (*Id.* ¶ 54). Throughout the first seven months of 2023, FAS continued adjusting, testing, and reprogramming the robots on Hydro Systems' production floor. (*Id.* ¶ 55). In July 2023, FAS ceased working on the robots. (*Id.* ¶ 57). The Sanding Robot currently does not function at all, as it has a bathtub stuck inside of it, making it non-operational. (*Id.* ¶ 58).

Meanwhile, on March 21, 2022, Hydro Systems paid FAS $348,000, and on June 15, 2022, Hydro Systems paid FAS an additional $232,000. (*Id.* ¶ 18). To date, Hydro Systems has paid FAS a total of $928,000. (*Id.* ¶ 19).

## Legal Standard

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex*, 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence

and all factual inferences in the light most favorable to the party opposing the motion. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996). Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). All reasonable doubts should be resolved in the favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). In addition, the court must "avoid weighing conflicting evidence or making credibility determinations." *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000). When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine dispute for trial. *Fitzpatrick*, 2 F.3d at 1115 (citations omitted).

On cross-motions for summary judgment, "[t]he standard of review . . . does not differ from the standard applied when one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." *Loiseau v. Thompson, O'Brien, Kemp & Nasuti, P.C.*, 499 F. Supp. 3d 1212, 1219 (N.D. Ga. 2020) (quoting *GEBAM, Inc. v. Inv. Realty Series I, LLC*, 15 F. Supp. 3d 1311, 1315–16 (N.D. Ga. 2013)). "The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. Cross-motions may . . . be

16

probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts." *Id.* (citing *U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 972 F. Supp. 2d 1339, 1341 (N.D. Ga. 2013)).

## Discussion

The Court first addresses FAS's partial motion for summary judgment on the issue of consequential damages and then turns to Hydro Systems' motion on liability and on FAS's counterclaims.

## I.    FAS's Motion for Partial Summary Judgment

FAS seeks partial summary judgment on the issue of Hydro System's claim for damages for "lost production, lost sales, wasted materials, increased labor costs, lost time and productivity of Hydro Systems personnel . . . ." (Doc. 1 at 46) on the grounds that such damages are incidental and consequential damages, and therefore barred by the terms of the Proposal expressly exculpating both parties from those damages. *See* Background § II, *above*. The Court agrees.

### A.    Consequential Damages in Sales Contracts

Many a first-year law student has trudged through *Hadley v. Baxendale* [1854] 156 Eng. Rep. 145, 145-46; 9 EX. 341, 341. That case involved a delay in shipping a broken crankshaft to a factory which in turn led the affected miller to seek "damages for their inability to supply their customers with flour during the

period of delay." Paul S. Turner, *Consequential Damages:* Hadley v. Baxendale *Under the Uniform Commercial Code*, 54 SMU L. Rev. 655, 657 (2001). That case, in barring such damages for lost profits, is often (rightly or wrongly) credited with expounding the principle of consequential damages in contract. *But see id.* ("The term 'consequential damages' does not appear anywhere in the court's opinion.").

In any case, the distinction between proximate or direct and consequential or indirect damages in contract has survived today. Under Georgia's version of the UCC,[9] incidental and consequential damages are distinguished from the

---

[9] The Proposal, which is governed by Georgia law (Doc. 1-1 at 9, 11), called for a hybrid sales and services transaction which raises a question of whether and to what extent Georgia's UCC applies. O.C.G.A. § 11-2-106(5) ("'Hybrid transaction' means a single transaction involving a sale of goods and . . . [t]he provision of services . . . ."). Under Georgia law, in a hybrid transaction "[i]f the sale-of-goods aspects predominate, [the UCC] applies to the transaction but does not preclude application in appropriate circumstances of other law to aspects of the transaction which do not relate to the sale of goods."). O.C.G.A. § 11-2-102(2)(b). Upon review of the Proposal, it appears that only $33,200 of the $1,160,000 purchase price is specifically earmarked for installation, which implies that the sale of goods aspect predominates. *See J. Lee Gregory, Inc. v. Scandinavian House, L.P.*, 433 S.E.2d 687, 689–90 (Ga. Ct. App. 1993) ("What was the dominant purpose of the transaction in the case sub judice? Was it the sale of goods or the rendition of services? It can hardly be said that the sale of the windows was 'incidental' to the transaction. Rather it would appear that the rendition of services was the incidental factor. After all, approximately two-thirds of the cost of the transaction was allocated to the windows. . . . Thus, we think the predominant character of the transaction was the sale of goods, even though a substantial amount of service was involved in installing the goods. The mere fact that Scandinavian House would not have purchased the windows unless plaintiff installed them is of no consequence"). Moreover, the services aspect of the Proposal seems limited to setup and deployment and the Proposal does not appear to contemplate an ongoing services relationship. (Doc. 1-1 at 5). Lastly, both Parties cited the UCC in their briefing.

default "measure of damages for nondelivery or repudiation by the seller," which "is the difference between the market price at the time when the buyer learned of the breach and the contract price," unless the buyer "'cover[s]' . . . by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller," in which case damages are "the difference between the cost of cover and the contract price." O.C.G.A. §§ 11-2-712, -713. For goods that have been accepted, "[t]he measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." O.C.G.A. § 11-2-714(2).

All of these remedies provide that in addition to these direct or proximate damages, the seller may also recover "incidental or consequential damages," which are defined by the U.C.C. as follows:

> (1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation, and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses, or commissions in connection with effecting cover, and any other reasonable expense incident to the delay or other breach.

---

(Doc. 29-1 at 5–6; Doc. 30-1 at 17). For these reasons, the Court concludes that the Proposal is predominately a sale of goods and therefore the UCC applies.

(2) Consequential damages resulting from the seller's breach include:

> (a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
>
> (b) Injury to person or property proximately resulting from any breach of warranty.

O.C.G.A. § 11-2-715. In keeping with *Hadley,* Georgia considers lost profits and production delays stemming from the sale of goods to be consequential damages. *Sunstate Indus., Inc. v. VP Grp., Inc.*, 679 S.E.2d 824, 828 n.9 (Ga. Ct. App. 2009); *see also B & D Carpet Finishing Co. v. Gunny Corp.*, 281 S.E.2d 354, 355 (Ga. Ct. App. 1981) ("Even prior to the enactment of the UCC provision, Georgia permitted the recovery of the cost of paying idle labor and other items of special damage as consequential damages flowing from a breach of contract.").

Hydro Systems' reliance on *Holiday Hospitality Franchising, LLC v. J&W Lodging, LLC*, No. 1:17-CV-01663-ELR, 2019 WL 3334614, at *7 (N.D. Ga. Mar. 7, 2019), which held that lost profits in a licensing agreement were actual damages and not consequential damages, is misplaced. First, that case was not a sales contract governed by the UCC, which strictly defines direct damages and delineates them from indirect and consequential damages. Second, in a licensing agreement, the object of the transaction is that the licensee will utilize the licensed

property to profit in business subject to paying a portion of that profit in the form of royalties. *Cf. Bennett v. Associated Food Stores, Inc.*, 118 Ga. App. 711, 715, 165 S.E.2d 581, 585 (1968) ("Profits, as used in this context, is to mean 'the gain which the plaintiff would have made if he had been permitted to complete his contract.'") (quoting *Wallace v. Tumlin & Stegall*, 42 Ga. 462, 471 (1871)); *see also Wallace*, 42 Ga. at 470–71 ("[O.C.G.A. § 13-6-8], speaking of the damages which are allowed for breach of contract, includes the profits which are the immediate fruit of the contract."). In contrast, in a contract for goods, the object of the transaction is to purchase goods for a given price. O.C.G.A. § 11-2-301 ("The obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract."). As such, *Holiday Hospitality Franchising* does not alter the basic premise that in a contract for the sale of goods, lost profits and labor costs are incidental or consequential damages.[10] And as the Court discusses next, a contract for the sale of goods may limit incidental or consequential damages.

### B.    Application and Enforceability of Exculpation of Consequential Damages

Georgia's UCC Article 2 permits parties to a sales contract to exculpate one another from incidental or consequential damages. Specifically, O.C.G.A. § 11-2-

---

[10] Similarly, Hydro Systems' insistence that "FAS has waived any argument that the contract's damages limitation precludes any of Hydro Systems'[] damages claims" is baseless. (Doc. 32 at 5).

719(1)(a) provides for a general rule that a sales contract may limit the measure of damages:

> (a) **The agreement** may provide for remedies in addition to or in substitution for those provided in this article and **may limit or alter the measure of damages recoverable under this article, as by limiting the buyer's remedies** to return of the goods and repayment of the price or **to repair and replacement of nonconforming goods or parts** . . . .

(emphasis added). This general rule has two exceptions. First, "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided" under Article 2 without regard to the limited remedy provision. O.C.G.A. § 11-2-719(2). Second, and relevant here, "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." O.C.G.A. § 11-2-719(3). Georgia law provides a presumption that "[l]imitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not." *Id.*

The Proposal does not meet either exception to contractual exculpation. Hydro Systems' sole cursory argument that an exclusive "agreement to repair or replace" fails of its essential purpose when there is a "refusal to remedy within a reasonable time, or a lack of success in the attempts to remedy" relies on irrelevant

case law governing when a breach of warranty arises.[11] (Doc. 32 at 9 n.4) (quoting *Space Leasing Assocs. v. Atlantic. Bldg. Sys., Inc.*, 241 S.E.2d 438, 441 (Ga. Ct. App. 1977)). As the Court will explain below, there is a fact dispute as to whether FAS's further performance under the Proposal's warranty was excused. The possibility of an excuse defense does not negate the essential purpose of the Proposal.

Moreover, Hydro Systems does not even attempt to argue that the Proposal's exculpatory clause is unconscionable.[12] It cannot seriously argue the clause is procedurally unconscionable where it specifically negotiated that the clause be reciprocal. (Doc. 1-1 at 11). And as the Supreme Court of Georgia has explained with regard to substantive unconscionability, because the UCC specifically provides for prima facie unconscionability in one circumstance, courts should not presume a limitation of consequential damages in other circumstances is substantively unconscionable. *NEC Techs., Inc. v. Nelson*, 478 S.E.2d 769, 771 (Ga.

---

[11] Moreover, under the UCC, direct damages from a breach of warranty are specifically delineated from incidental or consequential damages. O.C.G.A. § 11-2-714 (providing that "[i]n a proper case any incidental and consequential damages under Code Section 11-2-715 may also be recovered [in addition to the measure of damages for breach of warranty].").

[12] "[C]ourts have generally divided the relevant factors into procedural and substantive elements. . . . Procedural unconscionability addresses the process of making the contract, while substantive unconscionability looks to the contractual terms themselves." *NEC Techs., Inc. v. Nelson*, 478 S.E.2d 769, 771 (Ga. 1996) (citing UCC–Unconscionability Warranty Disclaimer, 38 A.L.R.4th 25, §§ 2, 3(a)(b)).

1996) ("The Legislature could have provided that a limitation on consequential property damages in the case of consumer goods is prima facie unconscionable, as it did with consequential damages for personal injuries, but it chose not to do so."). Absent other evidence of substantive unconscionability, the Court must find that the Proposal's exculpatory clause is enforceable and applies to bar Hydro Systems' claims for lost production, lost sales, wasted materials, increased labor costs, lost time and productivity of Hydro Systems personnel; partial summary judgment as requested by FAS is appropriate.[13]

## II.    Hydro Systems' Motion for Partial Summary Judgment

Hydro Systems' motion for partial summary judgment seeks a determination that FAS breached the Proposal as a matter of law, and non-liability for FAS's counterclaim (Doc. 30-1 at 1–2, 13). However, for the reasons that follow, the Court finds material fact disputes preclude summary judgment as to each of these issues.

---

[13] The Court notes that FAS's partial motion for summary judgment does not appear to argue that the limitation of liability under the Proposal should bar direct damages under other sections of Article 2. O.C.G.A. §§ 11-2-714(2), -608(3), 711(1); 712. The Court assumes these are issues for trial.

### A.    Hydro Systems' Claims of Breach for Failure to Deliver Conforming Goods

Hydro Systems first claims breach of contract for failure to deliver conforming goods. The Proposal included a basis section listing the following items:

> ➢ Each robot cell will be capable of bathtub models with maximum dimensions up to 36 inches wide by 72 inches long. For larger tubs, FAS must evaluate robot reach using the 3D models of each tub.

> ➢ As requested, our scope of work and pricing is based on programming twelve unique tub models. For reference, each of the three sizes within the Alamo family will require its own robot program.

> ➢ The sanding process will use three sandpaper grits of 220, 400, and 1000.

> ➢ Gel coating will be manually applied after the sanding process and before the polishing process. FAS has no scope of work related to gel coat application.

> ➢ The polishing process will use two buffing compounds.

> ➢ Hydro Systems will provide 3D models for every tub to be programmed.

(Doc. 1-1 at 1). The scope of work summary excluded the following:

> Tub locating fixtures are not currently included in the scope of work/pricing. FAS will require 3D models of each tub in order to quote the tub fixtures.

> Parts introduced into each system must be consistent with an "ideal" or nominal part. Parts that are out- of-range will cause system faults and production stoppage.

These robot systems will process tubs to a more consistent finish in less time than manual labor, but there are no provisions for correcting issues from the molding process or repair/rework process.

(*Id.*). These exclusions were clarified in Appendix A, Rev. 4:

- Gel coating not included within scope of work ("SOW"). Is Hydro going to be performing gel coating?

  **Correct – Gel Coating is outside the scope of this project.**

  . . . .

- There are no provisions for correcting issues from the molding process or repair/rework process. What happens if there is an issue? Who is responsible for remedying the issue and who is liable for the cost?

  **Quality issues from the molding or repair processes cannot be overcome by the sanding robot. These types of issues are outside our control and clearly not in our scope of work. Repairs need to meet Hydro Systems' quality standards before a tub is loading into the sanding robot system.**

(*Id.* at 10).

Hydro Systems contends that, setting aside any issue of delay,[14] FAS materially breached the Proposal by failing to deliver conforming goods under the

---

[14] Hydro Systems does not seek summary judgment on a delay theory. (Doc. 30-1 at 5 n.1) ("Although the parties disagree about the causes for FAS's lengthy production delay, this delay and its causes are not material to Hydro Systems'[] claim here, as it is Hydro Systems'[] position that the robots still do not function as promised, more than a year after the delayed delivery, and Hydro Systems is not currently seeking a ruling that the delay itself breached the contract."). Hydro

Proposal, i.e. robots that "process tubs to a more consistent finish in less time than manual labor." (Doc. 30-1 at 12). The problem with this argument is that it is riddled with underlying fact questions.

First, "[n]onconformity is generally a question of fact for a jury." *Tuni Gap Enters., LLC v. MarineMax E., Inc.*, No. 2:21-CV-20-RWS, 2022 WL 18459849, at *8 (N.D. Ga. Aug. 15, 2022) (citing *Esquire Mobile Homes, Inc. v. Arrendale*, 356 S.E.2d 250, 252 (Ga. Ct. App. 1987)). Mr. Pursley offered his testimony that Hydro Systems' Marketing Director Kenneth Steinhardt told him that "the sanding bot is doing its job but the polishing bot is not," but that in Mr. Pursley's opinion "the polishing robot delivered a consistent finish" such that FAS "fulfilled the requirement of the Proposal." (Pursley Aff. ¶¶ 53–54). Hydro Systems argues that this affidavit is contradicted by the record, but that just creates a fact dispute. Hydro Systems also argues that Mr. Pursley's affidavit should not be accepted because it is self-serving, but "an affidavit which satisfies Rule 56 of the Federal Rules of Civil Procedure may create an issue of material fact and preclude summary judgment even if it is self-serving and uncorroborated." *United States v. Stein*, 881 F.3d 853, 854 (11th Cir. 2018) (overruling cases to the contrary).

---

Systems also does not seek a ruling regarding the delay in programming. (*Id.* at 6 n.3).

Moreover, "where one party's cooperation is necessary to the agreed performance of the other but is not seasonably forthcoming, the other party in addition to all other remedies . . . [i]s excused for any resulting delay in his own performance." O.C.G.A. § 11-2-311(3)(a); *see also* O.C.G.A. § 13-4-23 ("If the nonperformance of a party to a contract is caused by the conduct of the opposite party, such conduct shall excuse the other party from performance."). FAS set forth a number of arguments why Hydro Systems' own actions led to any non-conformity, (Doc. 33 at 15–16), including applying gel coating before sanding instead of "after the sanding process and before the polishing process,"[15] and these create a fact dispute as to whether FAS's obligation to deliver conforming goods or seasonably cure a defect was excused. *Cf. Madden v. Nat'l Life Ins. Co.*, No. 219CV168FTM38MRM, 2019 WL 4140954, at *3 (M.D. Fla. Aug. 30, 2019) ("The issue of Madden's cooperation with National Life's claims investigation is a factual issue that is premature at the motion to dismiss stage and if Madden failed to timely notify National Life of her disability, it could be that such a failure was excused under the circumstances."). Hydro Systems' claims that FAS waived its

---

[15] Hydro Systems argues that the contract's reference to gel coat being applied after sanding does not preclude the possibility that gel coat would also be applied before sanding (Doc. 44 at 7, 12 n.3), but accepting this argument requires the Court to view the evidence in the light most favorable to Hydro Systems which the Court cannot do on summary judgment. *See* O.C.G.A. § 13-2-1 ("The construction of a contract is a question of law for the court. Where any matter of fact is involved, the jury should find the fact.").

excuse defense or that the parties modified the Proposal to conform to the gel coat by continuing to attempt to work with the gel coat, (Doc. 44 at 10–11), also raise jury questions. *Integrated Micro Sys., Inc. v. NEC Home Elecs. (USA), Inc.*, 329 S.E.2d 554, 559 (Ga. Ct. App. 1985).

Finally, even assuming that the robots do not conform to the Proposal, to determine whether Hydro Systems may mount a claim for breach of contract for failure to deliver conforming goods (as opposed to a breach of warranty, discussed in the next section), the Court must answer a series of questions: First, whether Hydro Systems accepted the robots;[16] and if so, second, whether non-conformity substantially impaired value and either (a) acceptance was made on the reasonable assumption that any non-conformity would be seasonably cured or (b) if Hydro

---

[16] It is unclear from the briefing, but it appears that Hydro Systems is arguing that because FAS allegedly never delivered "conforming" goods, it never had to accept or reject the robots and therefore may mount a claim for non-delivery without regard to whether it either (a) rejected within a reasonable time after delivery, (b) accepted on assumption of cure, or (c) may revoke acceptance for latent non-conformity. (Doc. 30-1 at 12) ("FAS has failed to perform its most basic obligation under the contract. In the Proposal, FAS specified that it would provide robots that could polish and sand tubs 'to a more consistent finish in less time than manual labor.'"). The Court does not interpret the UCC to provide this remedy. While "[t]ender of delivery requires that the seller put and hold conforming goods at the buyer's disposition," O.C.G.A. § 11-2-503(1), and "[t]ender of delivery is a condition to the buyer's duty to accept the goods," O.C.G.A. § 11-2-507(1), the UCC recognizes that an improper tender may be cured, O.C.G.A. § 11-2-507, or even accepted, O.C.G.A. § 11-2-601. Because it is undisputed that FAS made some delivery of goods under the Proposal, the proper analysis is to determine whether rejection, acceptance, or revocation properly occurred.

Systems later discovered non-conformity, it notified the FAS of any breach within a reasonable time after it was discovered or should have been discovered; and if either or both are true, third, whether the non-conformity was not seasonably cured and if applicable whether revocation of acceptance thereafter occurred within a reasonable time. O.C.G.A. §§ 11-2-606 to -608, -714; *see also* O.C.G.A. §§ 11-2-608(3) (timely revocation equivalent to rejection), -508(2) (seller may cure rightly rejected tender after reasonable time in certain circumstances). All of these questions are generally considered jury issues. *Griffith v. Stovall Tire & Marine, Inc.*, 329 S.E.2d 234, 236 (Ga. Ct. App. 1985) ("It is true that issues such as whether an effective revocation of acceptance was made, whether reasonable notice of revocation was given to the seller, and whether the value of the goods was substantially impaired are ordinarily matters for determination by the trior of fact, even where the buyer has continued to use nonconforming goods after an alleged revocation of acceptance.") (citing *Trailmobile Div. of Pullman v. Jones*, 164 S.E.2d 346 (Ga. Ct. App. 1968); *Jacobs v. Metro Chrysler-Plymouth*, 188 S.E.2d 250 (Ga. Ct. App. 1972); *Hub Motor Co. v. Zurawski*, 278 S.E.2d 689 (Ga. Ct. App. 1981)); *Tuni Gap Enters.*, 2022 WL 18459849, at *10 ("To have rightfully revoked its acceptance, [buyer] must have accepted the Boat either knowing of the nonconformity and reasonably assuming that it would be cured or without knowing of the nonconformity and accepting it because of the difficulty of discovering it . . . . [and]

what the buyer knew is ordinarily a question of fact for the jury.") (citing *Griffith*,

329 S.E.2d at 236–37); *Car Transp. Brokerage Co. v. Blue Bird Body Co.*, 322 F. App'x

891, 897 (11th Cir. 2009) ("Although the statutory opportunity to 'seasonably cure'

does not entitle a seller to unlimited attempts to cure a defect, it does require a

buyer to provide a seller with a reasonable time in which to attempt to make

repairs. . . . What constitutes a reasonable time in which to cure depends on the

nature, purpose, and circumstances of a particular case.") (citing O.C.G.A. § 11-1-

205(2), (3)). Accordingly, fact disputes preclude a determination that FAS breached

the Proposal by failing to deliver conforming goods.

### B.    Hydro Systems' Claims of Breach for Breach of Warranty

Hydro Systems makes similar arguments as to its claim for breach of

warranty. Georgia law provides the following with respect to express warranties:

> (1) Express warranties by the seller are created as
> follows:
>
> > (a) Any affirmation of fact or promise made by the
> > seller to the buyer which relates to the goods and
> > becomes part of the basis of the bargain creates an
> > express warranty that the goods shall conform to
> > the affirmation or promise.
>
> > (b) Any description of the goods which is made
> > part of the basis of the bargain creates an express
> > warranty that the goods shall conform to the
> > description.
>
> . . . .

O.C.G.A. § 11-2-313. "Warranties whether express or implied shall be construed as consistent with each other and as cumulative, but if such construction is unreasonable the intention of the parties shall determine which warranty is dominant." O.C.G.A. § 11-2-317.

A buyer who has accepted goods may nonetheless bring suit for breach of warranty. O.C.G.A. § 11-2-714(2). "The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." *Id.*

For the same reasons that the Court could not reach summary judgment as to whether the robots were non-conforming goods, the Court cannot determine whether the robots conformed to the description warranted in the Proposal. *See Horne v. Claude Ray Ford Sales, Inc.*, 290 S.E.2d 497, 499 (Ga. Ct. App. 1982) (questions of breach of warranty are for jury). Similarly, the Court cannot determine whether any duty to repair or replace set forth in the contract was excused by Hydro Systems' own conduct with respect to its manufacturing processes and if that excuse was somehow waived or modified by continued performance.

### C.    FAS's Counterclaims

FAS's Counterclaim contains three counts: Count I for Breach of Contract for "failing to pay FAS for the services rendered pursuant to the contract and failing to perform material terms of the contract, including but not limited to, the obligation to create reasonable final acceptance criteria for the project"; Count II Breach of Covenant of Good Faith and Fair Dealing; and Count III for Quantum Meruit as well as two counts for attorney's fees. (Doc. 9 ¶¶ 39–54).

Hydro Systems seeks summary judgment on Count I and II on the grounds of non-breach. (Doc. 30-1 at 19). It also points out that "there is no independent cause of action for violation of the covenant [of good faith] apart from breach of an express term of the contract." (*Id.*) (quoting *Morrell v. Wellstar Health Sys., Inc.*, 633 S.E.2d 68, 72 (Ga. Ct. App. 2006)); *see also Stuart Enters. Int'l, Inc. v. Peykan, Inc.*, 555 S.E.2d 881, 884 (Ga. Ct. App. 2001) ("In contracts governed by the UCC, the failure to act in good faith in performing a contract does not create an independent cause of action.").

On the question of non-payment, Hydro Systems raises two arguments. First, that under the Proposal, the contractual milestones requiring payments were never reached. (Doc. 30-1 at 21) ("The remaining balance on the contract price is not outstanding because it never became due under the plain terms of contract, which call for 10% of the purchase price within thirty days of the "[c]ompletion of

FAT at FAS," and another 10% within thirty days of the "[c]ompletion of [s]tart-up at Hydro Systems' facility," which was "not to exceed 30 days from shipment."). But whether and when FAT was completed or waived is a fact dispute and whether Hydro Systems' own failure to cooperate in providing samples and conforming the gel coat to the Proposal excused completion of performance at Hydro Systems' facility are both fact disputes.

Also, as explained below FAS argues that Hydro Systems' own breach in failing to create final acceptance criteria excused the condition precedent of completion of start-up at the facility. (Doc. 33 at 23) (citing *Ga. 20 Props. LLC v. Tanner*, 564 S.E.2d 459, 462 (Ga. Ct. App. 2002) ("A party cannot avoid the obligations of a contract by frustrating the performance of a condition precedent."); *cf. also* O.C.G.A. §§ 11-2-311(3) (providing for excuse for lack of cooperation), -615 ("Delay in delivery or nondelivery in whole or in part by a seller . . . is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made . . . ."). Moreover, even if FAS could not maintain an action for the purchase price on the grounds that the price has not "become[] due," the seller can "nevertheless be awarded damages for nonacceptance" after "the buyer has wrongfully rejected or revoked acceptance." O.C.G.A. § 11-2-709(1), (2) (citing O.C.G.A. § 11-2-708).

Here, whether Hydro Systems accepted the robots subject to seasonable cure and/or properly revoked acceptance is an issue of fact as set forth above.

Similarly, Hydro Systems' second argument, that payment of the purchase price is excused when a seller fails to deliver conforming goods pursuant to O.C.G.A. §§ 11-2-507(1), -508, is bound up in the question of whether it accepted the robots subject to seasonable cure and/or properly revoked acceptance, as "[t]he buyer must pay at the contract rate for any goods accepted." O.C.G.A. § 11-2-607(1). Lastly, to the extent that Hydro Systems contends it is entitled to "deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract," O.C.G.A. § 11-2-717, this too is bound up in the fact disputes precluding its own breach claim. And Hydro Systems is not entitled to summary judgment on damages, because at a minimum there is a fact dispute as to whether FAS is entitled to the balance of the contract as set forth above.

Lastly, Hydro Systems is entitled to summary judgment on Count III for Quantum Meruit. In its Response Brief, FAS argues that it provided services not contemplated by the Proposal. (Doc. 33 at 24). In a hybrid transaction predominated by the sale of goods, the UCC "does not preclude application in appropriate circumstances of other law to aspects of the transaction which do not relate to the sale of goods." O.C.G.A. § 11-2-102(2)(b). Moreover, "[u]nless

displaced by the particular provisions of this title, the principles of law and equity. . . shall supplement its provisions." O.C.G.A. § 11-1-103(b). Under Georgia general contract law, the general rule is "no recovery may be had in quantum meruit when a contract governs all claimed rights and responsibilities of the parties," but "a party to a contract who accepts valuable services in excess of those contemplated in the contract may be liable to pay for such services if they are necessary to complete the contract." *Bollers v. Noir Enters., Inc.*, 677 S.E.2d 338, 341–42 (Ga. Ct. App. 2009) (citing *Choate Constr. Co. v. Ideal Elec. Contractors*, 541 S.E.2d 435 (Ga. Ct. App. 2000)).

However, Hydro Systems is correct that the Proposal already governs extra work:

> **Onsite Startup**
> For both robot cells, FAS has included a total of 300 man-hours of installation supervision and startup assistance at Hydro Systems. All startup assistance is based on work being performed on a continuous basis and during normal Factory Automation Systems working hours with one mobilization to the job site. **Additional time or mobilizations to the job site are available on an as needed basis at Factory Automation Systems' standard hourly rates.**
>
> . . .
>
> **4) EXTRA WORK AND CHANGES IN SCOPE:** All changes to the basis of the proposal which affect quantities, types or configuration of hardware or which affect the engineering and design responsibilities or other labor requirements are to be submitted in writing

36

> to Factory Automation Systems for prior pricing and are
> to be approved by the Purchaser in wiring before such
> changes are incorporated into the order. Pricing of
> changes shall be based on pricing in effect at the time of
> the change.

(Doc. 1-1 at 5, 8). Thus, partial summary judgment on this claim is appropriate.

## Conclusion

As the above opinion explains, this case involves a lot of moving parts (no pun is intended). Trying this case to a jury will pose a number of complexities, both in terms of demonstrating conformity to the Proposal and in navigating the various UCC provisions at issue. The Court advises the parties to again attempt mediation.

For the above reasons, it is

**ORDERED** that Defendant and Counterclaim Plaintiff's Motion for Partial Summary Judgment (Doc. 29) is **GRANTED**. It is

**FURTHER ORDERED** that Plaintiff and Counterclaim Defendant's Motion for Partial Summary Judgment (Doc. 30) is **GRANTED IN PART** as to Count III of the Counterclaim and **DENIED IN PART** in all other respects. It is

**FURTHER ORDERED** that the Parties are **DIRECTED** to submit a proposed consolidated pretrial order within 28 days of the date of entry of this Order. If the parties intend to mediate this dispute, they may obtain a stay of this deadline by contacting the Court's courtroom deputy.

**SO ORDERED** this 10th day of March, 2025.

Victoria Marie Calvert
United States District Judge